

# UNITED STATES DISTRICT COURT
### Eastern District of Michigan, Northern Division

UNITED STATES OF AMERICA,

v.

Louai Abdelhamied Othman,
Adham Abdelhamid Othman,
Maruan Awad Muhareb.

**CRIMINAL COMPLAINT**

Case No. 06- MJ- 30401 -BC

FILED
AUG 1 6 2006
U.S. DISTRICT COURT
BAY CITY, MICHIGAN

I, Special Agent Andrea Kinzig, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief.

**Louai Abdelhamied Othman, Adham Abdelhamid Othman, and Maruan Awad Muhareb, defendants herein, did**

(A) From some time unknown until approximately August 11, 2006, conspired to defraud consumers and providers of telephone goods and services by trafficking in counterfeit goods or services contrary to Title 18, United States Code, section 2320 and circumventing copyright protection systems contrary to Title 17, United States Code, sections 1204(a) and 1201(a)(1)(A), and committed overt acts in furtherance of that conspiracy, all in violation of Title 18, United States Code, section 371, and

(B) On or about August 11, 2006, with the intent to promote the carrying on of a specified unlawful activity, did conduct a financial transaction involving property which was the proceeds of a specified unlawful activity, that is trafficking in counterfeit goods, in that the defendants purchased cellular telephones using the proceeds of previous cellular telephone transactions, in violation of 18 U.S.C. § 1956(a)(3).

I further state that this complaint is based on the following facts:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI), and

have been so employed since January 2005. I am currently assigned to the Bay City, Michigan Resident Agency of the Detroit Field Office. During the course of my duties I have received specialized training in the investigation of economic crimes and I have worked with agents and other law enforcement officers who have extensive experience in such cases. Prior to my employment with the FBI, I was employed as an accountant in the State of Ohio for approximately three years. I am a Certified Public Accountant.

2. As part of my employment, I have become aware of a fraud conspiracy which I will describe in further detail below. For the reasons also outlined below, I submit there is probable cause to believe that the three individuals who were arrested in Caro, Michigan on August 11, 2006, Louai Abdelhamied Othman, Adham Abdelhamid Othman, and Maruan Awad Muhareb, defendants herein, are members of that conspiracy, and that the defendants engaged in money laundering to promote an unlawful activity.

3. As part of my investigation to date I have learned that during the past twelve months small groups of individuals have been crossing this country and making bulk purchases of cellular telephones at retail outlets such as Wal-Mart, K-Mart, Shop-Ko, Dollar General, among others. The purchases are generally made using cash. Many of the retail outlets have adopted policies restricting the number of cellular telephones that can be purchased by a single customer. Apparently in response to such store policies, the purchases are often made in the middle of the night in an apparent attempt to avoid

the scrutiny of these transactions that might exist during normal business hours.

4. I am aware that cellular telephones, obtained in the manner similar to the manner that the defendants in this case obtained the cellular telephones, are being used to defraud legitimate telephone companies. My awareness of this fraudulent scheme is based on (A) my review of various civil complaints which have been filed in federal court by telephone companies against individuals and companies that have allegedly defrauded the telephone companies, and (B) my consultation with agents from various federal law enforcement agencies.

5. This fraud scheme involves prepaid cellular telephones. For example, prepaid cellular telephones are manufactured by Nokia for TracFone and labeled with the names of both companies, that is Nokia and TracFone. During the manufacturing process, Nokia installs proprietary software in the telephones which allows the telephones to be activated only by use of a TracFone card. TracFone sells the telephones for less than what it is charged by Nokia, but makes up the loss by what it charges consumers for the TracFone prepaid airtime cards needed to activate the telephones.

6. The prepaid Nokia/TracFone cellular telephones are susceptible to fraudulent use if the TracFone software is removed from those telephones; doing so enables the Nokia telephone to be programmed for use through any cellular telephone service provider that the user may choose. Members of the fraud conspiracy at issue

obtain Nokia/TracFones, remove the TracFone software – and often the TracFone trademark identification – and sell the altered telephones as genuine Nokia telephones to realize a profit. When that occurs, TracFone cards are not needed by the telephone user. TracFone incurs a financial loss due to its inability to require consumers to buy its card to make the telephones it has marketed at below cost prices into operable telephones.

7. In addition, both TracFone and Nokia's registered trademarks are violated by the procedure described above. When the altered telephones are re-sold they are no longer genuine Nokia telephones, though they apparently still bear the Nokia trademark. Whether or not the TracFone trademark identification is removed from the exterior of the telephone, TracFone's proprietary software has been deleted.

8. In a verified civil complaint, Nokia has alleged that the brand name Nokia is the eighth most valuable brand in the world. The complaint also alleges that the altered cellular telephones Nokia manufactures for TracFone are apparently being sold to consumers in counterfeit Nokia packaging intended to deceive consumers by making the consumers believe that they are buying genuine Nokia telephones. Thus, consumers, Nokia and TracFone are all defrauded in this aspect of the fraud scheme. TracFone has estimated to investigators that to date over 800,000 of their telephones have been fraudulently converted as described above.

9. At approximately 1:50 a.m. on August 11, 2006, the Caro Police

Department was contacted by an employee at a Wal-Mart in Caro, who advised that three males had just purchased 30 to 40 cellular telephones and had a large quantity of additional cellular telephones in their vehicle. Shortly after receiving this telephone call, officers executed a traffic stop of the suspects' vehicle for making an improper left-hand turn. The passengers identified themselves as Louai Abdelhamied Othman, Adham Abdelhamid Othman, and Maruan Awad Muhareb, all of Mesquite, Texas. In the vehicle, officers observed hundreds of cellular telephones.

10. Officers subsequently determined that the vehicle contained approximately 999 telephones, $1,800 in cash, a laptop computer, GPS tracking system, a digital camera, and a laser sights. Most of the cellular telephones had the batteries removed. Most of the cellular telephones were Nokia models 2126 and 1100.

11. When questioned by FBI agents, the three men stated that a number of businesses and individuals in Dallas, Texas, purchase cellular telephones from hundreds of people like themselves. The men stated that they and others would buy telephones for approximately $21 each and sell them to the purchasers for as much as $38.50, depending on the model of telephone. The three men realized the largest profit by selling Nokia 2126 telephones to the purchasers. The purchasers specified that the telephones should be delivered to them with the batteries separated from the telephones. The purchasers reportedly stated that they wanted the batteries separated because they were easier to

count and ship in that condition. The three men stated that they believed that the purchasers sold the telephones to middlemen in California, New York, or Miami, who then reprogrammed the telephones and sold them overseas.

12. All three men stated that they traveled the country to buy the prepaid cellular telephones because the Nokia 2126 telephones, which provided the highest profit margin, were not readily available in Texas. They acknowledged that they went to multiple states and purchased the entire stock of telephones from as many stores as possible, including Wal-Mart, K-Mart, and Dollar General. Though they admitted knowing that the policies of those stores prohibited selling more than three telephones per customer, they stated that they would make their purchases at night when store personnel tended to be less likely to adhere to those policies. The men reported that they had spent over $20,000 in cash buying cellular telephones since they left Texas in early August. The three men indicated that they had made previous cellular telephone buying trips over the last three months, but the number of trips reported varied, depending on who answered the question, between three and five. Two of the men told me that they used money from earlier bulk cellular telephone sales to purchase the cellular telephones found in their possession. The transportation of currency for the purpose acknowledged by the defendants is a financial transaction as defined in 18 U.S.C. § 1956(c)(4). The use of money obtained from earlier cellular telephone transactions constitutes a transaction

involving proceeds of a specified unlawful activity under 18 U.S.C. § 1956(a)(3).

13. Based on discussion with other agents, I understand that cellular telephone software can be erased by means of a computer using software available on the Internet. Though they did not admit doing so, the three men had a laptop and Internet access which, in turn, gave them the ability to remove TracFone software from the Nokia telephones in their possession.

14. Though the three men had almost a thousand cellular telephones in their joint possession, the van in which they were riding contained less than 150 original packages for those telephones. The men acknowledged that they would discard the original packaging, including such things as the instructions and the charging units, keeping only the telephones and the batteries as directed by the people who would purchase the telephones from them. While this practice may have served to save space, as the three men claimed, it also made it easier to repackage the telephones with counterfeit Nokia trademarks but without the TracFone trademarks as discussed above as one method of fraudulently using the telephones.

15. As indicated above, the van in question contained approximately one thousand cellular telephones. Most, if not all, of the cellular telephones were separated from their batteries. In addition, the van contained what appears to be the three men's personal cellular telephones, digital signal transfer connectors, a black spiral notebook

with handwritten entries, Microsoft Street & Trip 2006 (which is a form of mapping software stored on computer discs), a box containing Microsoft Windows Vista Beta 2 (that is computer operating software also on a CD), a box knife, an HP Compaq laptop computer, a Sony Playstation and a game disc, a Cingular Motorola digital camera, telephone adaptors, power adaptors, USB cable, a GPS antenna, a Palm pilot, a laser sight, assorted connectors, telephone cable, patch cable, memory sticks, a Blackberry unit, a jump drive, an IPOD, a Wal-Mart bag with assorted receipts, and bank records. Maruan Awad Muhareb had eighteen $100 bills on his person.

16. Based on all of the above, I submit that there is probable cause to believe that, Louai Abdelhamied Othman, Adham Abdelhamid Othman, and Maruan Awad Muhareb, defendants herein,

(A) From some time unknown until approximately August 11, 2006, conspired to defraud consumers and providers of telephone goods and services by trafficking in counterfeit goods or services contrary to Title 18, United States Code, section 2320 and circumventing copyright protection systems contrary to Title 17, United States Code, sections 1204(a) and 1201(a)(1)(A), and committed overt acts in furtherance of that conspiracy, all in violation of Title 18, United States Code, section 371, and

(B) On or about August 11, 2006, with the intent to promote the carrying

on of a specified unlawful activity, did conduct a financial transaction involving property which was the proceeds of a specified unlawful activity, that is trafficking in counterfeit goods, in that the defendants purchased cellular telephones using the proceeds of previous cellular telephone transactions, in violation of 18 U.S.C. § 1956(a)(3).

_____
Special Agent Andrea Kinzig

Subscribed and sworn to before me this 16th day of August, 2006

_____
CHARLES E. BINDER
U.S. MAGISTRATE JUDGE

Janet L. Parker, Assistant U.S. Attorney